1

2

3

4

5

6

7

8          IN THE UNITED STATES DISTRICT COURT

9          FOR THE EASTERN DISTRICT OF CALIFORNIA

10   WILLIAM FRANCIS KLAUS,

11          Plaintiff,                    No. 2:11-cv-0086 GGH

12      vs.

13

     MICHAEL J. ASTRUE,                   ORDER
14   Commissioner of
     Social Security,

15
            Defendant.
16   _____/

17          Plaintiff seeks judicial review of a final decision of the Commissioner of Social

18   Security ("Commissioner") denying his applications for Disability Insurance Benefits ("DIB")

19   and Supplement Security Income ("SSI") under Titles II and XVI, respectively, of the Social

20   Security Act ("Act").  For the reasons that follow, plaintiff's motion for summary judgment is

21   denied, defendant's cross-motion for summary judgment is granted, and judgment is entered for

22   defendant.

23   BACKGROUND

24          Plaintiff, born September 30, 1952, applied on April 18, 2007 for DIB and SSI,

25   alleging that he became disabled on March 9, 2006.  (Tr. at 18, 61-64, 101-05, 106-10.)  Plaintiff

26   contended that he was unable to work primarily due to Hepatitis C and depression.  (Tr. at 127,

1    313, 340.) Plaintiff's claims were denied initially and upon reconsideration. (Tr. at 18, 61-64.)

2    Thereafter, plaintiff requested a hearing before an administrative law judge ("ALJ"), which was

3    conducted on December 8, 2008 in Stockton, California. (Tr. at 18, 77, 26-60.) David M.

4    Dettmer, an impartial vocational expert ("VE"), also appeared at the hearing. (Tr. at 18, 26.)

5            Subsequently, in a decision dated March 30, 2009, ALJ Sandra K. Rogers

6    determined that plaintiff was not disabled. (Tr. at 25.) The ALJ made the following findings:[1]

7            1.      The claimant meets the insured status requirements of the
                     Social Security Act through September 30, 2011.
8
9            2.      The claimant has not engaged in substantial gainful activity
                     since March 9, 2006, the alleged onset date (20 CFR
                     404.1571 *et seq*., and 416.971 *et seq*.).
10
11           3.      The claimant has the following severe impairments: status
                     post left wrist fusion; history of hepatitis C, currently

12
13       [1] Disability Insurance Benefits are paid to disabled persons who have contributed to the
     Social Security program. 42 U.S.C. § 401 et seq.  Supplemental Security Income is paid to
14   disabled persons with low income. 42 U.S.C. § 1382 et seq.  Both provisions define disability, in
     part, as an "inability to engage in any substantial gainful activity" due to "a medically
15   determinable physical or mental impairment. . . ." 42 U.S.C. §§ 423(d)(1)(a) & 1382c(a)(3)(A).
     A parallel five-step sequential evaluation governs eligibility for benefits under both programs.
16   See 20 C.F.R. §§ 404.1520, 404.1571-76, 416.920 & 416.971-76; Bowen v. Yuckert, 482 U.S.
     137, 140-42, 107 S. Ct. 2287 (1987).  The following summarizes the sequential evaluation:
17           Step one:  Is the claimant engaging in substantial gainful
     activity?  If so, the claimant is found not disabled.  If not, proceed
     to step two.
18           Step two:  Does the claimant have a "severe" impairment?
     If so, proceed to step three.  If not, then a finding of not disabled is
19   appropriate.
             Step three:  Does the claimant's impairment or combination
20   of impairments meet or equal an impairment listed in 20 C.F.R., Pt.
     404, Subpt. P, App.1?  If so, the claimant is automatically
21   determined disabled.  If not, proceed to step four.
             Step four:  Is the claimant capable of performing his past
22   work?  If so, the claimant is not disabled.  If not, proceed to step
     five.
23           Step five:  Does the claimant have the residual functional
     capacity to perform any other work?  If so, the claimant is not
24   disabled.  If not, the claimant is disabled.
     Lester v. Chater, 81 F.3d 821, 828 n.5 (9th Cir. 1995).
25       The claimant bears the burden of proof in the first four steps of the sequential evaluation
     process. Bowen, 482 U.S. at 146 n.5, 107 S. Ct. at 2294 n.5.  The Commissioner bears the
26   burden if the sequential evaluation process proceeds to step five.  Id.

                                                   2

asymptomatic; migratory polyarthralgias; history of drug abuse in full sustained remission; and a depressive disorder, not otherwise specified (20 CFR 404.1521 *et seq.* and 416.921 *et seq.*).

4.    The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1525, 404.1526, 416.925 and 416.926).

5.    After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work.  Mentally, the claimant has no limitations in his ability to complete simple tasks and only moderate limitations in his ability to complete detailed and complex tasks (20 CFR 404.1567(b) and 416.967(b)).

6.    The claimant is capable of performing past relevant work as a bottling line attendant or a sampler.  This work does not require the performance of work-related activities precluded by the claimant's residual functional capacity (20 CFR 404.1565 and 416.965).

7.    The claimant has not been under a disability, as defined in the Social Security Act, from March 9, 2006 through the date of this decision (20 CFR 404.1520(f) and 416.920(f)).

8.    The claimant's substance abuse disorder is not a contributing factor material to the determination of disability (20 CFR 404.1535 and 416.935).

(Tr. at 20-25.)  The ALJ's decision became the final decision of the Commissioner when the Appeals Council denied plaintiff's request for review on November 18, 2010.  (Tr. at 1-5.)

ISSUES PRESENTED

      Plaintiff's motion presents three issues for review: (1) whether the ALJ erred in failing to acknowledge a treating physician's opinion concerning plaintiff's left wrist motion restrictions; (2) whether the ALJ improperly evaluated opinion evidence concerning plaintiff's mental impairments; and (3) whether the ALJ erroneously found that plaintiff's hepatitis C was asymptomatic and therefore improperly discredited plaintiff's testimony.

\\\\\\

3

1    LEGAL STANDARDS

2           The court reviews the Commissioner's decision to determine whether (1) it is

3    based on proper legal standards pursuant to 42 U.S.C. § 405(g), and (2) substantial evidence in

4    the record as a whole supports it.  Tackett v. Apfel, 180 F.3d 1094, 1097 (9th Cir.1999).

5    Substantial evidence is more than a mere scintilla, but less than a preponderance.  Connett v.

6    Barnhart, 340 F.3d 871, 873 (9th Cir. 2003) (citation omitted).  It means "such relevant evidence

7    as a reasonable mind might accept as adequate to support a conclusion."  Orn v. Astrue, 495 F.3d

8    625, 630 (9th Cir. 2007), quoting Burch v. Barnhart, 400 F.3d 676, 679 (9th Cir. 2005).  "The

9    ALJ is responsible for determining credibility, resolving conflicts in medical testimony, and

10   resolving ambiguities."  Edlund v. Massanari, 253 F.3d 1152, 1156 (9th Cir. 2001) (citations

11   omitted).  "The court will uphold the ALJ's conclusion when the evidence is susceptible to more

12   than one rational interpretation."  Tommasetti v. Astrue, 533 F.3d 1035, 1038 (9th Cir. 2008).

13   ANALYSIS

14          (1) Whether the ALJ erred in failing to acknowledge a treating physician's

15   opinion concerning plaintiff's left wrist motion restrictions

16          Plaintiff contends that the ALJ failed to address the opinion of plaintiff's former

17   treating orthopaedic surgeon, Dr. Craig Bottke, concerning plaintiff's left wrist motion

18   restrictions.

19          The weight given to medical opinions depends in part on whether they are

20   proffered by treating, examining, or non-examining professionals.  Holohan v. Massanari, 246

21   F.3d 1195, 1201-02 (9th Cir. 2001); Lester v. Chater, 81 F.3d 821, 830 (9th Cir. 1995).

22   Ordinarily, more weight is given to the opinion of a treating professional, who has a greater

23   opportunity to know and observe the patient as an individual.  Id.; Smolen v. Chater, 80 F.3d

24   1273, 1285 (9th Cir. 1996).

25          To evaluate whether an ALJ properly rejected a medical opinion, in addition to

26   considering its source, the court considers whether (1) contradictory opinions are in the record;

4

and (2) clinical findings support the opinions.  An ALJ may reject an *uncontradicted* opinion of a treating or examining medical professional only for *"clear and convincing"* reasons.  Lester, 81 F.3d at 830-31.  In contrast, a *contradicted* opinion of a treating or examining professional may be rejected for *"specific and legitimate"* reasons.  Lester, 81 F.3d at 830.  While a treating professional's opinion generally is accorded superior weight, if it is contradicted by a supported examining professional's opinion (supported by different independent clinical findings), the ALJ may resolve the conflict.  Andrews v. Shalala, 53 F.3d 1035, 1041 (9th Cir. 1995) (citing Magallanes v. Bowen, 881 F.2d 747, 751 (9th Cir. 1989)).  The regulations require the ALJ to weigh the contradicted treating physician opinion, Edlund, 253 F.3d at 1157,[2] except that the ALJ in any event need not give it any weight if it is conclusory and supported by minimal clinical findings.  Meanel v. Apfel, 172 F.3d 1111, 1114 (9th Cir.1999) (treating physician's conclusory, minimally supported opinion rejected); see also Magallanes, 881 F.2d at 751.  The opinion of a non-examining professional, without other evidence, is insufficient to reject the opinion of a treating or examining professional.  Lester, 81 F.3d at 831.

In this case, plaintiff, who is right hand dominant, initially sustained a left wrist injury during a motorcycle accident in 1975 for which he underwent surgery and received a silicone scaphoid implant.  (Tr. at 45, 353.)  Subsequently, on March 13, 2000, plaintiff again injured his wrist while picking up a box of saws weighing around seventy pounds at work.  (Tr. at 353.)  Upon evaluation by orthopaedic surgeon Dr. Bottke, he was found to have severe left wrist silicone synovitis secondary to breakdown of the previous silicone scaphoid implant, aggravated by the lifting injury at work, which may have caused a fracture and displacement of the implant.  (Tr. at 353.)  Thereafter, he underwent a further surgical procedure involving fusion of the left wrist and the fourth and fifth carpometacarpal joints which were unstable.  (Tr. at 353.)

---

[2]  The factors include: (1) length of the treatment relationship; (2) frequency of examination; (3) nature and extent of the treatment relationship; (4) supportability of diagnosis; (5) consistency; and (6) specialization.  20 C.F.R. § 404.1527.

1          On March 5, 2001, Dr. Bottke completed a "Primary Treating Physician's

2  Permanent and Stationary Report" in connection with plaintiff's workers' compensation claim.[3]

3  (Tr. at 353-63.)  In that report, Dr. Bottke stated that X-rays of the left wrist have shown

4  complete fusion in satisfactory alignment and opined that plaintiff's recovery could be

5  considered "permanent and stationary" with evidence of residual permanent disability.  (Tr. at

6  353-54.)  He noted that plaintiff had no flexion, extension, or radial or ulnar deviation due to the

7  fusion of the left wrist, but had full pronation and supination with no significant tenderness of the

8  wrist.  (Tr. at 354.)  He further stated that plaintiff had a slight restriction of pinch strength and a

9  moderate loss of grip strength in the left hand.  (Tr. at 354.)  Subjective findings included some

10  residual stiffness and some decreased dexterity in the fingers, but no reported pain.  (Tr. at 354.)

11  Dr. Bottke opined that plaintiff was able to continue with his regular work (at that time, as a

12  courier/clerk at California Cedar Products) without restrictions, but that there were activities at

13  home and at work that he was unable to perform.  (Tr. at 353-55.)  He observed that, on the open

14  labor market, plaintiff would be precluded from any job that would require wrist motion for

15  positioning of the hand.  (Tr. at 355.)

16          Plaintiff correctly notes that the ALJ's decision failed to explicitly address Dr.

17  Bottke's report.  However, Dr. Bottke's March 2001 report is significantly outdated with respect

18  to plaintiff's April 2007 claims, alleging disability as of March 2006, thus limiting its probative

19  value.  See Howard v. Barnhart, 341 F.3d 1006, 1012 (9th Cir. 2003) ("the ALJ is not required to

20  discuss evidence that is neither significant nor probative").  At the administrative hearing, the

21  ALJ specifically indicated that she was not concerned about the early orthopaedic records

22  concerning plaintiff's wrist, but inquired whether plaintiff had any current medical records.  (Tr.

23

24          [3] Although the report does not expressly state that it is related to a workers' compensation
      claim, such an inference can reasonably be drawn from the report itself.  It is addressed to
25  "Claims Administrator"; uses all the standard workers' compensation terminology such as
      "permanent and stationary status," "residual permanent disability," "apportionment," etc.; and
26  makes reference to the relevant California Labor Code provision.  (Tr. at 353-55.)

1   at 46-47.)[4]  Nevertheless, even if the ALJ were required to explicitly address the report, her

2   failure to do so here was harmless.  See Curry v. Sullivan, 925 F.2d 1127, 1129 (9th Cir.1990)

3   (harmless error analysis applicable in judicial review of social security cases).

4               In fact, the record contains much more recent evidence of plaintiff's hand

5   function.  On August 16, 2007, Dr. Philip Seu, a consultative examiner, tested plaintiff's hand

6   function as part of his evaluation.  (Tr. at 298-302.)  Dr. Seu found that plaintiff had full motor

7   strength (5/5) in his wrist flexors and extensors bilaterally and full grip strength (5/5) bilaterally.

8   (Tr. at 301.)  Although plaintiff had no range of motion of the left wrist, plaintiff's finger and

9   thumb joints had between 70-90 degree flexion and extension bilaterally.  (Tr. at 300.)  Dr. Seu

10  then opined that plaintiff had no manipulative limitations on reaching, handling, feeling,

11  grasping, and fingering.  (Tr. at 302.)  Although plaintiff makes much of the fact that plaintiff's

12  left wrist is permanently fused and has no range of motion, this is not dispositive of plaintiff's

13  resulting functional limitations.  Dr. Seu acknowledged that plaintiff in 2007 still had no range of

14  motion of the left wrist, but nonetheless concluded based on his examination that plaintiff had no

15  resulting limitations on reaching, handling, feeling, grasping, and fingering.  (Tr. at 302.)

16              Moreover, whatever concern the court may have concerning any residual conflict

17  between Dr. Bottke's 2001 report and Dr. Seu's 2007 assessment is dispelled by the fact that

18  plaintiff actually performed at least one of the two occupations identified by the ALJ as past

19  relevant work plaintiff could perform at step four  – bottling line attendant – for *several years*

20  *after Dr. Bottke's report*.  (Tr. at 24-25, 40, 44, 50-52, 128, 135.)  According to the Dictionary of

21  Occupational Titles excerpt provided by plaintiff's counsel, this position requires frequent

22  reaching, handling, and fingering, and a medium degree of finger dexterity and manual dexterity.

23  (Tr. at 177-80, 356-59.)  Plaintiff himself indicated that the position, as he performed it, required

24  handling, grabbing, and grasping objects for 8 hours a day.  (Tr. at 136.)  There is no evidence in

25

26      [4] After the hearing, but prior to the ALJ's decision, plaintiff then submitted Dr. Bottke's
    report to the ALJ.  (Tr. at 165-66.)

1   the record that plaintiff stopped working as a bottling line attendant due to any wrist problems –

2   indeed, although plaintiff's counsel raised the issue at the administrative hearing and in

3   subsequent correspondence/briefing, plaintiff did not even identify any hand/wrist problems and

4   corresponding limitations in his May 2007 disability report or upon examination by Dr. Seu in

5   August 2007.  (Tr. at 127, 298-302.)  There is also no record evidence suggesting that his wrist

6   condition had worsened since.

7           In light of the above, the court concludes that the ALJ's failure to discuss Dr.

8   Bottke's report was inconsequential to the nondisability determination and thus harmless.  As

9   such, remand is not warranted on this basis.

10          (2) Whether the ALJ improperly evaluated opinion evidence concerning plaintiff's

11  mental impairments

12          Because plaintiff has not received treatment for any mental health condition, the

13  record does not contain any opinion from a treating psychiatrist or psychologist.  However,

14  plaintiff argues that the ALJ improperly evaluated the opinion evidence from two examining

15  sources who provided opinions concerning plaintiff's mental impairments.

16          At the request of the Commissioner, consultative examiner and board-certified

17  psychiatrist Dr. Manolito Castillo performed a psychiatric evaluation of plaintiff on January 8,

18  2008.  (Tr. at 313-16.)  He noted that plaintiff's chief complaints were hepatitis C and

19  depression.  (Tr. at 313.)  Plaintiff reported that his life dramatically changed after he started

20  taking interferon for his hepatitis C, and he started experiencing depression, anger, and suicidal

21  thoughts.  (Tr. at 313.)  After his interferon treatment was discontinued, plaintiff continued to be

22  depressed with low energy levels, reduced sleep, reduced appetite, a lack of interest in

23  pleasurable activities, and reduced memory and concentration.  (Tr. at 313.)  Dr. Castillo

24  performed a mental status examination, which indicated that plaintiff's mannerisms, social

25  behavior, orientation, attention span, memory, abstraction ability, judgment, and thought

26  processes were normal.  (Tr. at 314-15.)  Although plaintiff described his mood as depressed, Dr.

1   Castillo observed his affect as euthymic, i.e. normal.  (Tr. at 314.)

2          Based on the examination, Dr. Castillo diagnosed plaintiff with a depressive

3   disorder and assessed a GAF score of 60.[5]  (Tr. at 315.)  Dr. Castillo stated that, although

4   plaintiff did well when he was assessed, plaintiff still had mental limitations as his mental illness

5   remained uncorrected.  (Tr. at 315.)  He opined that plaintiff had no limitations with respect to

6   his ability to socially interact with others at an age-appropriate level, understand instructions,

7   sustain an ordinary routine without sustained supervision, complete simple tasks, and avoid

8   normal hazards, and that he was capable of handling his own funds.  (Tr. 315.)  Dr. Castillo

9   further found that plaintiff was moderately limited in his ability to complete detailed tasks,

10  complete complex tasks, and concentrate for at least two-hour increments at a time in order to

11  maintain a regular work schedule.  (Tr. at 315.)

12         Subsequently, on November 27, 2008, at the request of plaintiff's counsel,

13  psychiatrist Dr. Les Kalman performed another psychiatric evaluation of plaintiff.  (Tr. at 339-

14  48.)  Plaintiff again reported similar complaints to Dr. Kalman, including depression, exhaustion,

15  and difficulty concentrating and making decisions, with thoughts of suicide.  (Tr. at 340-41.)

16  Upon examination, Dr. Kalman found that plaintiff was pleasant and cooperative, had average

17  speech and good eye contact, was alert and oriented, had good memory, and had above average

18  intelligence.  (Tr. at 341-42.)  His abstractions were generally intact, he had good insight and

19  judgment, and his form of thought was logical and goal oriented, although he was noted to be

20  depressed and frustrated.  (Tr. at 342.)

21         Dr. Kalman diagnosed plaintiff with an adjustment disorder, with depression

22  secondary to his medical condition (which he noted to be hepatitis C, hypertension, and chronic

23

24         [5]  GAF is a scale reflecting "psychological, social, and occupational functioning on a
    hypothetical continuum of mental health-illness."  Diagnostic and Statistical Manual of Mental
    Disorders 34 (4th ed. 2000) ("DSM IV").   According to the DSM IV, a GAF of 51-60 indicates
25  "[m]oderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR
    moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with
26  peers or co-workers)."  Id.

1   back pain), and assessed a GAF score of 55, stating that his condition was not expected to

2   improve significantly in the next twelve months.  (Tr. at 343.)  He stated that plaintiff was

3   competent to manage his own funds.  (Tr. at 343.)

4        Furthermore, Dr. Kalman opined that plaintiff was "not significantly limited"[6] in

5   his ability to remember locations and work-like procedures; understand, remember, and carry out

6   short and simple (one- or two-step) repetitive instructions or tasks; sustain an ordinary routine

7   without special supervision; work in coordination with or proximity to others without being

8   unduly distracted by them; interact appropriately with the general public or customers; ask simple

9   questions or request assistance from supervisors; maintain socially appropriate behavior and to

10  adhere to basic standards of neatness and cleanliness; respond appropriately to expected or

11  unexpected changes in the work setting; be aware of normal hazards and take appropriate

12  precautions; travel in unfamiliar places and/or use public transportation; and set realistic goals or

13  make plans independently of others.  (Tr. at 345-47.)  Dr. Kalman also assessed plaintiff as

14  "mildly limited"[7] in his ability to perform activities within a schedule, maintain regular

15  attendance and be punctual with customary tolerances; make simple work-related decisions;

16  accept instructions and respond appropriately to criticism from supervisors; and get along with

17  co-workers or peers without unduly distracting them or exhibiting behavioral extremes.  (Tr. at

18  346-47.)  Dr. Kalman stated that plaintiff was "moderately limited"[8] in his ability to understand,

19  _____

20      [6] "Not significantly limited" was defined as follows: "Performance of the designated
    work-related mental function is only minimally impaired, if at all.  For example, the individual
21  can perform this work-related function at a level equal to or greater than 90% of normal, and
    constantly or continuously during an 8-hour workday."  (Tr. at 345.)
22
        [7] "Mildly limited" was defined as follows: "Performance of the designated work-related
23  mental function is somewhat impaired.  For example, the individual can perform this work-
    related function at a level equal to or greater than 80-85% of normal in terms of speed and
24  accuracy, but the individual can perform the function only occasionally to frequently, (from 1/3
    to 2/3 of an 8-hour workday) but not constantly or continuously."  (Tr. at 345.)
25
        [8] "Moderately limited" was defined as follows: "Performance of the designated work-
26  related mental function is not totally precluded, but it is substantially impaired in terms of speed

1   remember, and carry out detailed (3 or more steps) instructions or tasks which may or may not be

2   repetitive; maintain attention and concentration for extended periods (the approximately 2-hour

3   segments between arrival and first break, lunch, second break, and departure) with four such

4   periods in a workday; and complete a normal workday and workweek without interruptions from

5   psychologically based symptoms and perform at a consistent pace without an unreasonable

6   number and length of rest periods.  (Tr. at 346.)

7            Dr. Kalman noted that unruly, demanding, or disagreeable customers even on an

8   infrequent basis; production demands or quotas; a demand for precision; and a need to make

9   quick and accurate, independent decisions in problem solving on a consistent basis would

10  increase plaintiff's level of impairment.  (Tr. at 347.)  Finally, he stated that plaintiff would be

11  unable to complete a workday at least three or four times a month, and estimated the date of

12  onset of these limitations to be 2006.  (Tr. at 348.)

13           As an initial matter, plaintiff contends that the ALJ erroneously concluded that Dr.

14  Castillo's and Dr. Kalman's opinions were inconsistent.  Certainly, at an initial glance, the

15  opinions appear somewhat similar in that they both assessed moderate limitations in plaintiff's

16  ability to complete complex/detailed tasks and concentrate for two-hour periods.  However, upon

17  closer examination, Dr. Kalman's specific definitions of terms such as "mildly limited" and

18  "moderately limited" are substantially different from the conventional understanding of these

19  terms as used in Social Security cases.  See footnotes 6-8, supra.  For example, Dr. Kalman

20  assessed plaintiff as "mildly limited" in his ability to perform activities within a schedule and

21  make simple work-related decisions, which would mean that, under Dr. Kalman's definition of

22  "mildly limited," plaintiff would be able to do this only up to 2/3 of the workday and not

23  constantly or continuously.  (Tr. at 345-46.)  Thus, these "mild" limitations would likely preclude

24  ─────────────────

25  and accuracy and can be performed only seldom to occasionally during an 8-hour workday, for
    example, for short durations lasting from 5 to 15 minutes not totalling [sic] more than 2 to 3
26  hours in an 8-hour workday."  (Tr. at 345.)

1  most if not all employment.  <u>Compare to</u> <u>e.g.</u> 20 C.F.R. § 404.1520a(d)(1) (stating that a "mild"

2  degree of limitation generally suggests that impairment is not severe).  As another example, Dr.

3  Kalman assessed plaintiff as "moderately limited" in his ability to maintain concentration for

4  two-hour periods, which would mean that, under Dr. Kalman's definition of "moderately

5  limited," plaintiff would only be able to concentrate for short durations lasting from 5 to 15

6  minutes not totaling more than 2-3 hours in a workday.  (Tr. at 345-46.)  Again, this "moderate"

7  limitation would almost certainly preclude all employment.  Additionally, Dr. Kalman stated that

8  plaintiff would be unable to complete a workday at least 3-4 times per month.  (Tr. at 348.)

9           Therefore, if anything, it is clear that Dr. Castillo's and Dr. Kalman's opinions

10  were not consistent.  Moreover, at the hearing the ALJ and VE specifically discussed Dr.

11  Kalman's unique definitions, indicating that the ALJ clearly recognized that Dr. Kalman was not

12  employing the conventional definitions of these terms as used in the Social Security context.[9]

13  This was appropriate, because ALJs have been cautioned not to assume that medical sources

14  using regulatory terms of art are aware of the regulatory definitions or conventional

15  understanding of those terms.  <u>See</u> SSR 96-5p, at *5.

16           Plaintiff next argues that the ALJ failed to provide specific and legitimate reasons

17  for rejecting Dr. Kalman's opinion.  The court disagrees.  The ALJ correctly noted that Dr.

18  Kalman failed to provide any objective evidence to support his excessive findings (as noted

19  above), which were also not supported by the other record evidence.  (Tr. at 23.)  <u>See</u> <u>Crane v.</u>

20  <u>Shalala</u>, 76 F.3d 251, 253 (9th Cir. 1996) (ALJ may reject check-off reports that fail to explain

21

22           [9] The ALJ labeled the definitions as "ridiculous" and "laughable" and advised plaintiff's
   counsel to tell Dr. Kalman to "stop using that form."  (Tr. at 53-57.)  Certainly, the definitions
23  are confusing and defy common sense – it is hard to see how a "mild" or "moderate" limitation
   can be logically defined so as to preclude virtually all employment.  Although the definitions
24  appear to be very thorough at an initial glance, they are in fact drafted so vaguely and broadly,
   and in such a complex manner, as to render it possible to construe virtually every mild or
25  moderate limitation as potentially disabling.  While Dr. Kalman is entitled to use whatever
   definitions he prefers, an ALJ need not accept such assessments when they are vague, internally
26  inconsistent, implausible, and defy common sense.

                                                    12

1   the bases for conclusions); Thomas v. Barnhart, 278 F.3d 947, 957 (9th Cir. 2002) (ALJ need not

2   accept even a treating physician's opinion that is conclusory and inadequately supported by

3   clinical findings).  Indeed, as the ALJ suggested, the description of plaintiff in Dr. Kalman's

4   report was also inconsistent with the severe limitations assessed.  (Tr. at 23.)  Although plaintiff

5   was noted to be depressed and frustrated, Dr. Kalman also found him to be pleasant and

6   cooperative, alert and oriented, with average speech and good eye contact, good memory, above

7   average intelligence, and with generally intact abstractions, good insight and judgment, and

8   logical and goal oriented form of thought.  (Tr. at 341-42.)  Also, the ALJ observed that Dr.

9   Kalman's opinion was contradicted by the opinion of Dr. Castillo, a board-certified psychiatrist,

10  whereas Dr. Kalman was not board certified in psychiatry, but instead board certified in the more

11  general field of disability analysis.  (Tr. at 23, 185-88, 313-16.)  Accordingly, the ALJ provided

12  specific and legitimate reasons for rejecting Dr. Kalman's opinion.[10]

13          Finally, plaintiff contends that the ALJ improperly evaluated Dr. Castillo's

14  opinion in several ways.  First, plaintiff points out that the ALJ inaccurately stated that Dr.

15  Castillo reported that plaintiff "was able to interact with co-workers, supervisors, and the general

16  public."  (Tr. at 21.)  However, Dr. Castillo found no limitation in plaintiff's ability to "socially

17  interact with others at an age-appropriate level."  (Tr. at 315.)  Although plaintiff's counsel

18  selectively interprets Dr. Castillo's assessment to be limited to informal social situations (e.g.

19  interaction with friends and family), Dr. Castillo placed no such qualifier on his assessment.

20  Consultative examiners are well aware that their opinions are sought primarily with respect to a

21  claimant's work-related limitations and it can be reasonably inferred that Dr. Castillo would have

22  included such an important qualifier if it were necessary.  Moreover, even Dr. Kalman opined

23

24          [10] The ALJ also stated that Dr. Kalman had no treatment relationship with the claimant
    since he was a consulting physician and had only seen the claimant one time.  (Tr. at 23.)  This in
    itself is not dispositive, because the same could be said with respect to consultative examiner Dr.
25  Castillo.  However, Dr. Kalman's not being a treating source certainly militates against giving his
    opinion any greater weight than Dr. Castillo's opinion.  Moreover, as discussed above, the ALJ
26  provided several other specific and legitimate reasons to discount Dr. Kalman's opinion.

1  that plaintiff was not significantly limited in his ability to interact appropriately with the general

2  public or customers, ask simple questions or request assistance from supervisors, and maintain

3  socially appropriate behavior.  (Tr. at 346-47.)  Thus, the ALJ's finding is supported by

4  substantial evidence.

5              Second, plaintiff argues that, contrary to the ALJ's summary in his decision, Dr.

6  Castillo never stated that plaintiff "could withstand the stress and pressures associated with an

7  eight-hour workday and day-to-day activities."  (Tr. at 21.)  While it is true that Dr. Castillo

8  never literally used those words, the ALJ reasonably drew such an inference from Dr. Castillo's

9  report.  Macri v. Chater, 93 F.3d 540, 544 (the "ALJ is entitled to draw inferences logically

10  flowing from the evidence").  As outlined above, Dr. Castillo only found moderate limitations in

11  plaintiff's ability to complete detailed tasks, complete complex tasks, and concentrate for at least

12  two-hour increments at a time in order to maintain a regular work schedule.  (Tr. at 315.)  The

13  Ninth Circuit has already held that moderate mental limitations do not even require vocational

14  expert testimony.  Hoopai v. Astrue, 499 F.3d 1071, 1077 (9th Cir. 2007) ("We have not

15  previously held mild or moderate depression to be a sufficiently severe non-exertional limitation

16  that significantly limits a claimant's ability to do work beyond the exertional limitation.")

17  Importantly, Dr. Castillo also found no limitations in plaintiff's ability to understand instructions,

18  complete simple tasks, or sustain an ordinary routine without sustained supervision.  (Tr. at 315.)

19  Thus, it can be reasonably inferred from Dr. Castillo's opinion that plaintiff could withstand the

20  usual stress and pressures associated with an eight-hour workday consistent with the limitations

21  assessed.

22              Third, plaintiff claims that the ALJ failed to mention Dr. Castillo's assessment

23  that plaintiff was moderately limited in his ability to concentrate for at least two-hour increments

24  in the hearing decision.  Again, while this is technically true, the error was clearly inadvertent

25  and harmless, because the ALJ specifically incorporated this limitation into his hypothetical to

26  the VE, who then testified that the hypothetical individual could perform plaintiff's past jobs of

1  bottling line attendant and sampler.  (Tr. at 47-48.)  The court declines to remand the case merely

2  to allow the ALJ to correct a technical deficiency in the written decision that did not affect the

3  ultimate nondisability determination.

4          Accordingly, the court concludes that the ALJ's analysis of the opinion evidence

5  concerning plaintiff's mental impairments is supported by substantial evidence in the record as a

6  whole.

7          (3) Whether the ALJ erroneously found that plaintiff's hepatitis C was

8  asymptomatic and therefore improperly discredited plaintiff's testimony

9          Plaintiff was diagnosed with hepatitis C[11] in 2004 during a routine workup for a

10 colonoscopy.  (Tr. at 193.)  He had elevated liver enzymes and mild viremia, and a June 18, 2004

11 liver biopsy revealed chronic hepatitis with grade 2 inflammation and stage 2 fibrosis.  (Tr. at

12 192, 240.)  However, around the time of his diagnosis, he reported that he generally felt well with

13 no nausea, vomiting, diarrhea, abdominal pain, or fatigue, and he refused treatment at that time.

14 (Tr. at 193, 215.)

15          In August 2005, after testing again showed significantly elevated blood levels

16 indicative of hepatitis C, plaintiff sought treatment from internal medicine and infectious

17 diseases specialist Dr. Salah Bibi, who diagnosed plaintiff with hepatitis C and chronic back

18 pain, and described plaintiff's general appearance as "healthy."  (Tr. at 215-21, 290-97.)  Plaintiff

19 started treatment with interferon (Pegasys and Ribavirin) on October 19, 2005, and Dr. Bibi

20 noted that he was tolerating the treatment well with minor side effects as of November 2, 2005.

21

22     [11] "Hepatitis C is a viral disease that leads to swelling (inflammation) of the liver...Of
people who get infected with hepatitis C, most develop a long-term (chronic) infection.  Usually
23 there are no symptoms.  If the infection has been present for many years, the liver may be
permanently scarred.  This is called cirrhosis.  In many cases, there may be no symptoms of the
24 disease until cirrhosis has developed.  The following symptoms could occur with hepatitis C
infection: Abdominal pain (right upper abdomen); Abdominal swelling (due to fluid called
25 ascites); Clay-colored or pale stools; Dark urine; Fatigue; Fever; Itching; Jaundice; Loss of
appetite; Nausea; and Vomiting."
26 See http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0001329/.

15

1   (Tr. at 213-14.)  However, between late 2005 and early 2006, plaintiff started reporting

2   increasing symptoms of being tired, moody, losing his temper, skin irritation, chest pain,

3   shortness of breath, dizziness, muscle/joint pain, and nausea.  (Tr. at 208-12.)

4          Plaintiff alleges disability as of March 9, 2006, and the medical records reveal that

5   on March 24, 2006, plaintiff reported to Dr. Bibi that he was unable to do his physical work.  (Tr.

6   at 207.)  In addition to hepatitis C, Dr. Bibi noted that plaintiff had anemia, a low white blood

7   cell count, and general malaise.  (Tr. at 207.)  On April 11, 2006, plaintiff reported similar

8   symptoms of fatigue and malaise to his primary health care provider, Dr. Jacqueline Galang, but

9   denied any fever, abdominal pain, nausea, vomiting, or diarrhea.  (Tr. at 269-70.)  Dr. Galang

10  noted that plaintiff's white blood cell count was low, but that his liver function tests were

11  normal.  (Tr. at 269.)  Subsequently, on April 24, 2006, plaintiff complained of shortness of

12  breath on exertion and difficulty swallowing, and Dr. Bibi interrupted his interferon treatment for

13  two weeks to allow plaintiff to regain his strength and to see if his shortness of breath improves.

14  (Tr. at 206.)  On May 8, 2006, plaintiff felt better, his white blood cell count went up, and he had

15  no shortness of breath or swallowing problems, and the interferon treatment was resumed.  (Tr. at

16  205.)  Thereafter, on September 6, 2006, Dr. Bibi again halted the interferon treatment for two

17  weeks when plaintiff reported exhaustion and diarrhea with a low white blood cell count and

18  anemia.  (Tr. at 201.)  Later that month, plaintiff also requested to stop the interferon treatment.

19  (Tr. at 200.)  On October 27, 2006, with laboratory tests showing that plaintiff's hepatitis C viral

20  load was still very elevated but that his liver function tests and blood count tests were normal,

21  Dr. Bibi determined that the interferon treatment was unsuccessful and should not be continued.

22  (Tr. at 199, 274.)

23          On January 3, 2007, Dr. Bibi released plaintiff to return to work at 40 hours per

24  week.  (Tr. at 198.)  However, on January 15, 2007, Dr. Galang reported that although plaintiff

25  was anxious to return to work, he did not clear his work physical due to high blood pressure.  (Tr.

26  at 277.)  He had no chest pain, shortness of breath, abdominal pain, diarrhea, joint pain, or

16

1    weakness, and was observed to be well nourished and well developed.  (Tr. at 277-78.)  Dr.

2    Galang diagnosed plaintiff with benign hypertension, intermittent heartburn, and some malaise

3    and fatigue; started him on blood pressure medication and a low-salt diet with exercise; and put

4    him on disability until February 12, 2007.  (Tr. at 278-79.)  On February 12, 2007, after plaintiff

5    sustained a left knee injury, Dr. Galang extended plaintiff's disability until March 5, 2007.  (Tr.

6    at 286-88.)  Subsequently, on March 5, 2007, plaintiff reported to Dr. Galang that although he

7    had some malaise, he was feeling good with no chest pains, shortness of breath, abdominal pains,

8    nausea, vomiting, fever, or diarrhea; his blood pressure was good; and he was ready to return to

9    work.  (Tr. at 260.)  He was diagnosed with benign hypertension, hepatitis C without hepatic

10   coma, hyperlipidemia, and arthritis, and Dr. Galang released him to return to work at 40 hours

11   per week on March 7, 2007.  (Tr. at 261-62.)

12           However, on March 9, 2007, plaintiff informed Dr. Bibi that he had quit his job

13   and that he experienced extreme fatigue, but that his hepatitis was not bothering him.  (Tr. at

14   197.)  March 20, 2007 treatment notes from Dr. Galang indicate that plaintiff had again not

15   passed his work physical due to high blood pressure at the time of the test and that Dr. Bibi had

16   put him on disability until May 8, 2007.  (Tr. at 197, 263.)  Plaintiff reiterated complaints of

17   fatigue and malaise with no fever, abdominal pains, nausea, or vomiting, and Dr. Galang again

18   diagnosed him with benign hypertension and discussed a low cholesterol diet and a need for

19   better blood pressure control.  (Tr. at 263-64.)  Two days later during a pre-colonoscopy physical

20   assessment,[12] plaintiff curiously denied any fatigue, as well as fever, shortness of breath, chest

21   pain, abdominal pain, joint pain, nausea, vomiting, constipation, or diarrhea, and the doctor

22   described plaintiff as a "well-developed, Caucasian male in no acute distress."  (Tr. at 255-56.)

23           Plaintiff saw Dr. Galang once more on May 14, 2007 primarily complaining of

24   erectile dysfunction.  (Tr. at 265.)  He reported that his symptoms were more or less stable with

25

26       [12] The colonoscopy revealed small internal hemorrhoids, and plaintiff was advised to
     increase fiber and fluid in his diet.  (Tr. at 257.)

1    some malaise and fatigue, but that he was able to go on with his daily routines.  (Tr. at 265.)  Dr.

2    Galang diagnosed plaintiff with erectile dysfunction and prescribed Cialis.  (Tr. at 266.)  The

3    administrative record contains no further medical records from treating providers between May

4    2007 and December 2008.  As discussed above, plaintiff was examined by consultative examiner

5    Dr. Philip Seu on August 16, 2007.  (Tr. at 298-302.)  However, at that time, plaintiff's chief

6    complaints were low back pain and joint pain, and after reviewing plaintiff's 2006-2007 medical

7    records and examining plaintiff, Dr. Seu opined that plaintiff's hepatitis C was relatively

8    asymptomatic.  (Tr. at 298, 301.)

9           Finally, in December 2008 plaintiff underwent blood work for hepatitis C at

10   Kaiser Manteca Medical Center.  (Tr. at 26, 349-52.)  A Dr. Arora stated that the blood work

11   showed that his hepatitis C antibodies were still positive and his liver enzymes elevated, and he

12   was advised to undergo viral load testing and an ultrasound of the liver.  (Tr. at 349.)

13          In this case, there is no dispute that plaintiff has been diagnosed with hepatitis C.

14   Instead, the issue is what functional limitations are attributable to plaintiff's hepatitis C and

15   whether they potentially render plaintiff disabled.  Plaintiff argues that, by finding plaintiff's

16   hepatitis C to be largely asymptomatic, the ALJ improperly discredited plaintiff's testimony in

17   this regard – for example, plaintiff's testimony that he became tired with less than two hours of

18   sitting and standing, that after doing about two hours of activity he was "beat" the rest of the day,

19   that he spent several hours a day reclining or sitting down with both feet up, and that he was

20   physically and emotionally unable to get up and go to work in the morning.  (Tr. at 33-34, 39.)

21          "Credibility determinations are the province of the ALJ" and are entitled to

22   deference if the ALJ provides sufficient reasoning supported by substantial evidence.  Fair v.

23   Bowen, 885 F.2d 597, 604 (9th Cir. 1989).  A two-step analysis is used to determine whether a

24   claimant's testimony regarding subjective pain or symptoms, and resulting functional limitations,

25   is credible.  First, the claimant "must produce objective medical evidence of an underlying

26   impairment which could reasonably be expected to produce the pain or other symptoms

1   alleged...." Smolen, 80 F.3d at 1281 (citations omitted).  "[T]he claimant need not show that her

2   impairment could reasonably be expected to cause the severity of the symptom she has alleged;

3   she need only show that it could reasonably have caused some degree of the symptom." Id. at

4   1282.  Second, once this initial showing is made and there is no affirmative evidence of

5   malingering, "the ALJ may reject the claimant's testimony regarding the severity of her

6   symptoms only if he makes specific findings stating clear and convincing reasons for doing so."

7   Id. at 1283-84; see also Vasquez v. Astrue, 572 F.3d 586, 591 (9th Cir. 2009).

8           "General findings are insufficient; rather, the ALJ must identify what testimony is

9   not credible and what evidence undermines the claimant's complaints." Lester, 81 F.3d at 834;

10  see also Dodrill v. Shalala, 12 F.3d 915, 918 (9th Cir. 1993).  In weighing a claimant's

11  credibility, the ALJ may consider, among other factors, her reputation for truthfulness;

12  inconsistencies in her statements and testimony, or between her statements or testimony and her

13  conduct; her daily activities; her work record; unexplained or inadequately explained failure to

14  seek treatment or to follow a prescribed course of treatment; and testimony from physicians and

15  third parties concerning the nature, onset, duration, frequency, severity, and effect of the

16  symptoms of which she complains. See Smolen, 80 F.3d at 1284.  However, the ALJ may not

17  find subjective complaints incredible solely because objective medical evidence does not

18  quantify them. Bunnell v. Sullivan, 947 F.2d 341, 345-46 (9th Cir. 1991).

19          As an initial matter, the court notes that the ALJ did not entirely discredit

20  plaintiff's allegations of fatigue and malaise.  Indeed, despite consulting examiner Dr. Seu's

21  assessment that plaintiff had no physical functional limitations, the ALJ limited plaintiff to light

22  work.  (Tr. at 22-23, 298-302.)  Nevertheless, to the extent that the ALJ discounted plaintiff's

23  testimony regarding his symptoms and functional limitations, the ALJ provided several specific,

24  clear, and convincing reasons for doing so.  The ALJ reasoned as follows:

25          I find [that plaintiff's] statements concerning the intensity, duration
            and limiting effects of those symptoms are not entirely credible for
26          the following clear and convincing reasons.  First, the objective

19

1                medical evidence does not show pathology reasonably likely to

cause the debilitating symptoms alleged. Second, the claimant's

2                treatment has been routine or conservative in nature. Third, the

record reflects some gaps in treatment, further indicating that the

3                claimant's symptoms and limitations have not been as serious as

has been alleged in connection with this application and appeal.

4                Fourth, there is no twelve month period where the claimant's

limitations provided disability. Fifth, the claimant is not taking

5                medications of a type and dosage consistent with his allegations.

Sixth, the record does not indicate that the claimant suffers from

6                debilitating side effects from his medication. Seventh, the

claimant's allegations of pain and limitations are excessive and not

7                consistent with treatment and medical findings. Eighth, no treating

or examining physician has opined that the claimant is totally and

8                permanently disabled from all work. Ninth, the claimant was able

to participate in the administrative hearing and respond to

9                questioning without any apparent difficulties. Tenth, concerning

his activities of daily living, the claimant has described daily

10              activities which are not limited to the extent one would expect,

given the complaints of disabling symptoms and limitations

11              (Exhibits 9E-10E; 7F, p. 2; 10F, p. 3).

12  (Tr. at 23.)

13         Substantial evidence supports the ALJ's finding that plaintiff's daily activities are

14  inconsistent with his allegations of disabling symptoms and limitations. (Tr. at 21, 23.) Plaintiff

15  told Dr. Seu that he took care of his elderly mother, which involved meal preparation and help

16  with transportation, and that he did household chores such as cleaning. (Tr. at 299.) Plaintiff

17  also informed Dr. Castillo that he attended to his mother's needs, washed dishes, vacuumed,

18  swept, did laundry, cooked, and was able to utilize public transportation independently, drive,

19  and handle his own funds. (Tr. at 315.) Plaintiff described a typical day to Dr. Kalman as "get

20  up, read the paper, wake his mom, make breakfast, walk the dog, make lunch, do a little in the

21  yard, nap, try to learn the guitar, dinner, bed." (Tr. at 343.) He went outside alone on a daily

22  basis to walk or drive, shopped for groceries once a week, went to the public library and out for

23  coffee once a week, and handled finances. (Tr. at 157-58.) To be sure, the record also contains

24  some contrary evidence, such as plaintiff and his wife's written statements, suggesting that

25  plaintiff's activities are more limited. (Tr. at 154-61, 162-64.) However, it is the function of the

26  ALJ to resolve any ambiguities, and the court finds the ALJ's assessment to be reasonable and

1 supported by substantial evidence.  See Rollins v. Massanari, 261 F.3d 853, 857 (9th Cir. 2001)

2 (affirming ALJ's credibility determination even where the claimant's testimony was somewhat

3 equivocal about how regularly she was able to keep up with all of the activities and the ALJ's

4 interpretation "may not be the only reasonable one").  As the Ninth Circuit explained:

5           It may well be that a different judge, evaluating the same evidence,
            would have found [the claimant's] allegations of disabling pain
6           credible.  But, as we reiterate in nearly every case where we are
            called upon to review a denial of benefits, we are not triers of fact.
7           Credibility determinations are the province of the ALJ...Where, as
            here, the ALJ has made specific findings justifying a decision to
8           disbelieve an allegation of excess pain, and those findings are
            supported by substantial evidence in the record, our role is not to
9           second-guess that decision.

10 Fair, 885 F.2d at 604.

11          Also, the ALJ properly considered her personal observations of plaintiff at the

12 hearing as part of the overall credibility evaluation, noting that he was able to participate in the

13 hearing and respond to questioning without any apparent difficulties.  Orn v. Astrue, 495 F.3d

14 625, 639 (9th Cir. 2007); Nyman v. Heckler, 779 F.2d 528, 531 (9th Cir. 1985); SSR 96-7p, at

15 *8.

16          Additionally, as is evident from the chronological summary of medical evidence

17 above, the ALJ reasonably inferred that there was no twelve month period where the claimant's

18 limitations rendered him disabled for purposes of the Social Security Act.  While plaintiff's

19 interferon treatment no doubt significantly impacted his physical and mental condition, especially

20 as of his alleged disability onset date of March 9, 2006, he finally ceased the treatment in October

21 2006, and both his treating physicians released him for full-time work on January 3, 2007 and

22 March 7, 2007.  The fact that he did not actually return to work and was put back on state

23 disability benefits was not the result of his hepatitis C, but instead that he did not pass his

24 specific employer's physical exam due to elevated blood pressure at the time.  Plaintiff's

25 employer's physical exam is not dispositive of disability for purposes of Social Security benefits

26 and here arguably conflicted with plaintiff's treating physician's diagnosis of benign

1  hypertension and her finding that plaintiff's blood pressure was acceptable when she examined

2  him on March 5, 2007 and released him for work on March 7, 2007.  (Tr. at 260, 262.)

3       Also, the ALJ correctly noted that no treating or examining physician had opined

4  that plaintiff was totally and permanently disabled from all work, and that his allegations of pain

5  and limitations were excessive and not consistent with treatment and medical findings.  Notably,

6  his treating physicians only took him off work for definite periods of time, a large portion of

7  which was due to the adverse side effects of the interferon treatment.  Consultative examiner Dr.

8  Seu examined plaintiff and found that his hepatitis C was relatively asymptomatic with no

9  resulting physical functional limitations.  Although plaintiff's subjective symptom testimony

10  cannot be discredited solely on the basis that it is not quantified by objective medical findings,

11  this was nevertheless a relevant factor for the ALJ to consider.

12       Furthermore, the ALJ reasonably found that plaintiff's gap in treatment between

13  May 2007 and December 2008 suggests that plaintiff's symptoms and limitations are not as

14  serious as he alleges.  Failure to seek consistent treatment is a proper consideration when

15  evaluating credibility.  See Burch v. Barnhart, 400 F.3d 676, 681 (9th Cir. 2005).  In his briefing,

16  plaintiff argues that it was improper to consider this factor, because he lost his health insurance

17  when he did not return to his job, was on very expensive COBRA coverage during the interferon

18  treatment, and could not get medical care until December 2008 when his wife's "new job"

19  allowed coverage through Kaiser.  (Dkt. No. 13-1 at 17-18.)  However, plaintiff never testified

20  that his wife got a "new job" allowing for health care coverage around December 2008 – he

21  stated that his wife obtained Kaiser health care coverage after he stopped working.  (Tr. at 40.)

22  At best, the record is ambiguous as to how long after plaintiff stopped working he was able to

23  obtain health care coverage through his wife.  Moreover, plaintiff also testified that he "became

24  real disillusioned with the medical field at the end of my Interferon treatment, and just kind of

25  stayed out for awhile."  (Tr. at 36.)  In any event, even if this were not a legitimate reason to

26  discount plaintiff's testimony, the error is harmless because the ALJ provided several other valid

1 reasons for only partially crediting plaintiff's testimony.  See Molina v. Astrue, 674 F.3d 1104,

2 1115 (9th Cir. 2012) (harmless error when ALJ provided one or more invalid reasons for

3 disbelieving a claimant's testimony, but also provided valid reasons that were supported by the

4 record).[13]

5        Therefore, the court concludes that the ALJ provided sufficient clear, convincing,

6 and specific reasons for partially discounting plaintiff's testimony regarding his alleged

7 symptoms and functional limitations, and that substantial evidence supports the finding that

8 plaintiff's hepatitis C is largely asymptomatic and does not render him disabled.

9        Finally, plaintiff contends that the ALJ's failure to discuss the December 2008

10 laboratory report submitted after the administrative hearing, showing that plaintiff's hepatitis C

11 antibodies were still positive and his liver enzymes elevated, constitutes reversible error.  (Tr. at

12 349.)  This argument lacks merit.  The brief report confirms that plaintiff still has hepatitis C, but

13 does not indicate that plaintiff has any specific functional limitations resulting from it.  It is well

14 known that persons infected with hepatitis C may be asymptomatic.  See

15 http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0001329/.  Indeed, when plaintiff was

16 diagnosed with hepatitis C in 2004, he reported that he felt well with no fatigue, despite the fact

17 that laboratory testing showed elevated liver enzymes and that a liver biopsy revealed chronic

18 hepatitis with grade 2 inflammation and stage 2 fibrosis.  (Tr. at 192-93, 215, 240.)  Dr. Bibi also

19 eventually cleared plaintiff to work despite the unsuccessful interferon treatment and a high

20

21    [13] The court also finds some of the ALJ's other reasons for discounting plaintiff's
22 credibility less persuasive, for example the ALJ's statements that there is no pathology reasonably likely to cause the debilitating symptoms alleged and that the claimant's treatment has been routine or conservative in nature.  As to the former, plaintiff was diagnosed with hepatitis
23 C, which the ALJ found could reasonably be expected to cause at least some degree of the alleged symptoms.  (Tr. at 23.)  The dispute centers more around the degree of symptoms and
24 functional limitations associated with the impairment.  As to the latter, plaintiff did receive interferon treatment for an extended time and a liver biopsy was done.  Nevertheless, as
25 discussed above, several other specific, clear, and convincing reasons support the ALJ's analysis regarding plaintiff's credibility and the extent of symptoms and functional limitations attributable
26 to plaintiff's hepatitis C.

1 hepatitis C viral load.  (Tr. at 198-99.)  Moreover, although the December 2008 laboratory report

2 advised plaintiff to undergo further viral load testing and an ultrasound of the liver (tr. at 349),

3 there is no evidence in the record that plaintiff completed such testing, what the test results were,

4 or that plaintiff obtained any further treatment for his hepatitis C (despite having testified that he

5 by then had access to health insurance through his wife's work).  Therefore, even assuming

6 *arguendo* that the ALJ erred by not discussing the December 2008 laboratory report, the error

7 was harmless.  Even if the December 2008 laboratory report were considered and fully credited,

8 the court finds it implausible that a reasonable ALJ would have come to a different disability

9 determination.

10 CONCLUSION

11         Accordingly, for the reasons outlined above, IT IS HEREBY ORDERED that:

12       1.  Plaintiff's motion for summary judgment (dkt. no. 13) is DENIED;

13       2.  Defendant's cross-motion for summary judgment (dkt. no. 16) is GRANTED;

14 and

15       3.  Judgment is entered for defendant.

16 DATED: July 16, 2012

17                       /s/ Gregory G. Hollows
             UNITED STATES MAGISTRATE JUDGE

18

19 GGH/wvr
  Klaus.86.ss.wpd

20

21

22

23

24

25

26